UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: GARY S. KATZMANN, JUDGE, TIMOTHY REIF, JUDGE, JANE A. RESTANI, JUDGE

| | |
|---|---|
| AGS COMPANY AUTOMOTIVE SOLUTIONS AND CONSOLIDATED PLAINTIFFS<br><br>Plaintiffs,<br><br>v.<br><br>U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and the UNITED STATES OF AMERICA<br><br>Defendants. | Consol. Court No. 25-00255-3JP |

**DECLARATION OF BRANDON LORD
IN SUPPORT OF DEFENDANTS'
<u>OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>**

I, Brandon Lord, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby make the following declaration with respect to the above-captioned matter:

1. I am the Executive Director, Trade Programs Directorate, Office of Trade, U.S. Customs and Border Protection (CBP), a position I have held since July, 2022.  In my role, I lead CBP's strategic efforts to enforce and protect the revenue, including the implementation of tariff measures under Section 232 of the Trade Expansion Act of 1962 and the International Emergency Economic Powers Act.  I lead the administration of priority international trade issues, including Tariffs and Trade Remedies, Intellectual Property

Rights, Free Trade Agreements, Import Safety, Textiles and Antidumping and Countervailing Duties.

Previously, I served as the Acting Executive Director for Trade Policy and Programs, Office of Trade, from March 2021 until November 2021, and as the Deputy Executive Director for Trade Policy and Programs, Office of Trade, from November 2017 until July 2022.

2. This declaration is made to provide further context regarding the administrative burden CBP would face should the Court enjoin CBP from liquidating entries covered by this consolidated court action, in which plaintiffs are challenging duties imposed pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 et seq. under the following Executive Orders (hereinafter the "IEEPA Tariff Orders"):

    - Executive Order No. 14193, Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9,113 (Feb. 1, 2025), as amended;

    - Executive Order No. 14194, Imposing Duties to Address the Situation at Our Southern Border, 90 Fed. Reg. 9,117 (Feb. 1. 2025), as amended;

    - Executive Order No. 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9,121 (Feb. 1, 2025), as amended; and

    - Executive Order No. 14257, Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90 Fed. Reg. 15,041 (Apr. 2, 2025), as amended.

3. As of December 10, 2025, a total of over 34 million entries have been made, by over 301,000 importers, that are subject to duties imposed under the IEEPA Tariff Orders (the "subject entries"). As of December 10, 2025, the total amount of IEEPA duties and estimated duty deposits collected for entries covered by the IEEPA Tariff Orders is approximately $129 billion. Approximately 19.2 million entries remain unliquidated as of December 10, 2025. Approximately 19.8 million of the subject entries were filed as "informal" entries pursuant to the special entry procedures provided in subpart C of part 143 of the Customs Regulations in Title 19 of the Code of Federal Regulations. Pursuant to Customs Regulations at 19 C.F.R. § 159.10(a)(1), informal entries liquidate immediately upon payment by the importer of the duties due upon the entry. CBP does not have a process to prevent the liquidation of informal entries.

4. Should CBP be required to ensure that the liquidation of unliquidated entries subject to the IEEPA Tariff Orders does not occur, it would be tasked with managing an injunction of unprecedented scale and scope. The current Automated Commercial Environment ("ACE") system lacks the functionality to automatically prevent the liquidation of these entries. Consequently, CBP would be forced to undertake a highly labor-intensive, manual process involving the identification, individual notation, and continuous monitoring of each affected entry—a task that would require significant resources and introduce substantial risk of error, particularly when overlapping with existing suspensions pursuant to antidumping duty and countervailing duty ("AD/CVD") orders. This would place an extraordinary and sustained burden on CBP's operational capacity, diverting critical resources from trade enforcement priorities, revenue collection and the administration of the laws over which CBP has responsibility to enforce on a daily basis

Should the court enjoin CBP from liquidating the subject entries, CBP would need to perform the following steps:

a. CBP would need to identify the pertinent importer of record numbers ("IOR numbers"). An importer may not have the same name as the plaintiff with which it is associated (for example, a named plaintiff could be the parent company of the relevant importer), and some plaintiffs may have multiple affiliated importers, resulting in multiple IOR numbers being associated with a single plaintiff.

b. CBP would then have to identify the relevant CBP Center of Excellence and Expertise ("Center") that handles the account of each importer, as the Centers are generally responsible for effectuating court orders to enjoin liquidation.

c. Next, CBP would have to identify all the unliquidated entries of merchandise subject to duties under the relevant IEEPA Tariff Orders for each individual importer. To do this, CBP would have to generate a report for each IOR number identifying all entries filed during the relevant time period by liquidation status, and the more than 100 relevant headings of Chapter 99 of the Harmonized Tariff Schedule of the United States ("HTSUS"). Until it runs these reports and tabulates the results, CBP is unable to determine which entries would be subject to an injunction. Further, it would not be until that point that CBP would know what percentage of the over 19.2 million unliquidated entries subject to duties under the relevant IEEPA Tariff Orders are entries filed by the plaintiffs in these actions.

d. Once CBP has generated a report identifying the relevant unliquidated entries for each subject importer, to effectuate a court order enjoining liquidation, CBP

would have to enter a code for an injunction for every entry by entering the requisite code in the ACE record for that entry. Each entry record will also have to be notated to indicate the specific reason for the suspension. CBP could do this on either an entry-by-entry basis or by utilizing the "mass processing" function of ACE, which would permit CBP to change up to 9,999 entries at a time to "suspended" status, on an importer-by-importer basis. The mass update function requires Excel spreadsheets manually compiled by CBP personnel that identify batches of subject entries.

e. It is not uncommon for "mass processing" to identify entries that need to be individually evaluated and addressed, adding an unquantifiable amount of time given the unprecedented magnitude of this effort.

f. CBP cannot suspend liquidation for the approximately 15.5 million entries that have already liquidated.

5. The process described in paragraph 4 is further complicated if liquidation of an entry is already suspended pursuant to an AD/CVD order. CBP would not only have to identify which entries are already suspended pursuant to an AD/CVD order but also have to ensure that these entries are not prematurely liquidated if suspension is lifted by the Department of Commerce but the injunction remains in place. If the Department of Commerce provides notice of the lifting of suspension pursuant to an AD/CVD order, there is a significant risk that CBP personnel will overlook the indication that an additional suspension of liquidation is in place, and that an entry will liquidate even though the Court's order suspending liquidation is still in effect. Conversely, if an injunction in this litigation is lifted, but a suspension pursuant to an AD/CVD order is

still in place, the risk also exists that CBP personnel may prematurely liquidate that entry, creating problems in any corresponding AD/CVD proceedings.

6. For entries inadvertently liquidated during the pendency of a Court order enjoining liquidation, CBP would have to undertake the manual process of returning those entries, one-by-one, to unliquidated status upon order of the Court. Mass processing is not available for entries that have been inadvertently liquidated contrary to a Court order enjoining liquidation.

7. Furthermore, CBP would need to prevent the liquidation of *all future entries* subject to the IEEPA Tariff Orders. ACE does not have the functionality to automatically prevent the liquidation of non-AD/CVD entries. Therefore, future entries would not automatically be flagged as subject to the injunction at entry but would need to be manually updated on an importer-by-importer and entry-by-entry basis until any decision issued in this case becomes final. To ensure that liquidation is prevented for any newly-filed subject entries covered by an injunction, CBP would need to run reports again, likely every 30 days, for each importer, and then repeat the steps in paragraph 4 for entries filed during the 30-day period.

8. When litigation is completed and CBP is no longer enjoined from liquidating the subject entries, CBP would only have six months to liquidate those entries before they liquidate by operation of law pursuant to 19 U.S.C. § 1504(d). Given the enormous volume of subject entries, it is very likely that CBP would not be able to liquidate all such entries within the six month period, resulting in a potentially large volume of entries for which CBP would be unable to verify that the duties, taxes and fees were correctly declared, and thereby potentially putting a significant amount of lawful revenue at risk.

9. Should the Supreme Court rule in favor of the government, CBP would be required to perform a second manual process of undoing the suspension of liquidation for every impacted entry. Conversely, should the Court rule against the government, CBP would be required to conduct a second manual process of undoing the suspension of liquidation for every impacted entry and a third manual process of processing refunds for every impacted entry. Furthermore, suspension of liquidation will prevent CBP from processing any other corrections requested by the importer, including Post Summary Corrections, protests, etc.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 11th day of December, 2025.

BRANDON S LORD
Digitally signed by BRANDON S LORD
Date: 2025.12.11 21:52:41 -05'00'

Brandon Lord
Executive Director
Trade Programs
Office of Trade
U.S. Customs and Border Protection